Good morning, Your Honours. May it please the Court. My name is Oliver Stiefel. I represent Plaintiffs' Appellants. With me at Council table is Christopher Winter. I intend to reserve five minutes for rebuttal. We return to this Court on a challenge over the Forest Service's approvals of four old-growth timber sales in the Tongass National Forest based on the Deere model. On separate occasions, this Court in 2011 and then the District Court in 2014 ruled that the Forest Service's approvals of the four timber sales based on the Deere model were arbitrary and unsupported by the record. The Forest Service has now undergone two separate remand proceedings in which it has flip-flopped in its Deere modeling approach. On first remand, the agency corrected for its errors in the use of the Deere model. On second remand, however, the agency reverted back to the original Deere model runs that this Court remanded in 2011. The agency has offered no explanation for its change in position, and the explanation that it does provide based on the original records fundamentally conflicts with the scientific evidence in this case and with the factual and legal determinations that this Court and the District Court have already made. Now, with my presentation today, I intend to focus on three issues related to the Deere model, the vol strata issue, the Deere multiplier issue, and consistency with the standards and guidelines of the 1997 Forest Plan. Does your client believe that it is possible to arrive at a scientifically justifiable Deere population model? Yes, Your Honor, and the agency, in fact, used a scientifically defensible version of the Deere model on first remand. And your contention is that they reverted to an earlier, less scientifically defensible? That's exactly right. Why did the District Court approve that? I don't have the best answer to that, Your Honors. I would point the Court to the fact that this Court reviews the record de novo and doesn't accord any deference to the District Court's opinion. I can only speculate that there was some judicial fatigue. Judge Beislein noted at the outset of his opinion that it was unfortunate that the cases had taken so long to resolve, and he largely reverted to his original opinion on the issue, that this Court had reversed and vacated in the first Greenpeace one in 2011. So, if I may, I'd like to turn to the vol strata issue. And back to this Court's opinion in 2011, this Court took a hard look at the original records and it determined that vol strata measures timber volume, but that it is forest structure and not total timber volume that's relevant to the habitability of a piece of land. And I recognize that this Court didn't issue an explicit holding on the issue, but it did provide the agency with explicit guidance as to how it anticipated the agency would respond. And Judge Hawkins... Isn't that more than... Rather than violating the mandate of this Court, that your remedy there really lies with NMFA? That's right, Your Honor. So are you claiming that there was a violation of the mandate with respect to the vol strata data? With respect to vol strata, I think technically we're not claiming that there's a violation of the mandate. We chose to frame it up that way simply because we thought it was important to tether this round of appeals to the original 2011 opinion. So with vol strata, we're asking the Court to review based on the arbitrary and capricious standard of review and hold that the use of vol strata was arbitrary and contrary to NMFA. And so Judge Hawkins, just back to this evolution of the Deere model, on first remand, as the District Court found, the agency had abandoned the use of vol strata and it used a corrected version of the Deere model. And when it reran the Deere model on first remand, what did the agency find? It found Deere habitat numbers significantly lower. And this was attributable in part to the fact that the agency had substituted the reliable size density data set for the flawed vol strata data set. Now, this really just confirms what the agency has known all along. On the original records, it's evident. As this Court pointed out in its 2011 determination, the agency had already admitted that timber volume may be misleading when describing wildlife habitat. And it confirms what the agency has now been telling the public in recent project planning documents, that vol strata has no correlation to habitat quality. And so it's surprising, to say the least, Your Honor, that the agency, on second remand, abandoned those corrected results and reverted back to the original Deere model runs applying the vol strata data set. And so it has completely ignored this Court's guidance on the issue and it has supplied the Court with no new evidence and no new explanations that would provide a basis for this Court to revisit its earlier determinations about vol strata. And so we stand here before the Court asking this Court to convert its earlier determinations about vol strata into a holding that its use was arbitrary and capricious. I'll turn now, Your Honors, to the Deere multiplier issue, if I may. Now, I think it's critically important for this claim. Is this the proxy on proxy calculation? The proxy on proxy claim, Your Honor, relates to the vol strata issue. Our contention there is that under this Court's jurisprudence, specifically in Lance Counsel v. McNair and Lance Counsel v. Powell, the data set that the agency uses as a basis for its proxy on proxy modeling has to be reasonably reliable and accurate. And there's no question in this case that vol strata is not really reasonably reliable and accurate. Therefore, the proxy on a proxy approach crumbles. And that's supported, and I would say explicitly controlled, by Lance Counsel v. McNair and Lance Counsel v. Powell. Now, the Deere multiplier issue really gets to this Court's holding in the 2011 opinion, where it held that the Forest Service's use – Forest Service's approvals of the four timber sales were arbitrary and unsupported by the record because the agency had failed to articulate a rational explanation for its use of the Deere multiplier. Now, fast-forwarding to first remand, the agency corrected for its errors in the application of the Deere model. And that's not just my characterization, Your Honors. That's the characterization of the District Court at ER 36. And so on first remand, the agency used a defensible version of the Deere model, one that corrected for this 30% overestimation in habitat capability. And once again, Your Honors, that's not just my characterization. This time, it's the characterization of the Forest Service itself, who in recent project planning documents has stated that the old version of the Deere model was revised due to a misuse of the Deere multiplier that caused a 30% overestimation in habitat capability. So fast-forward to the second remand proceedings in 2015. The agency has completely changed its tune, abandoned those corrected results, and reverted back to the original Deere model runs. It hasn't explained its change in position. And the explanations that the agency... When did that happen? This was in 2015, Your Honor. And in our brief, we refer to what we call the remand memo, which was the memo that the agency prepared in response to Greenpeace 2, which was the District Court's 2014 opinion. And I would submit that that remand memo stands counter to the record before the agency. And really, that's the lens through which this court addresses the claim. Under the court's NIFMA jurisprudence, the court asks whether the explanation provided by the agency runs counter to the evidence before it. And so here, I just want to impress upon the court two things about the Deere multiplier. First, the Deere multiplier represents a constant, representing maximum habitat capability. Second, that the maximum habitat capability is 100 Deere per square mile. And that's reflected in this court's 2011 opinion, all of the record evidence. And fundamentally, it's reflected in the first remand proceedings, where the agency states that the areas of the Tongass National Forest with the most suitable winter habitat for Deere could be expected to support up to 100 Deere per square mile. Just a few quick points on the compliance with the standard and guideline issue. About 20, 25 Deere. With the application of the Deere multiplier that the agency was using for the original records and on second remand, the difference is an overestimation of about 30%. So it's a 30% overestimation in habitat capability. So here's where the rubber really hits the road, Your Honors. And this is consistency with the standards and guidelines of the 1997 forest plan. And specifically today, I'd like to talk about the wolf provision, which is wild 11-2-11-A-3 of the 1997 forest plan. And according to this court, the calculation or miscalculation of Deere carrying capacity affects all four projects. So this is significant. Now, on the original records, the agency claimed consistency with the standard and guideline of the forest plan based on the fact that all four of the timber sale areas would maintain above 18 Deere per square mile. But of course, that was based on the flawed version of the model. So the agency went back to the drawing board on first remand and applying the corrected version. The results really stood those original results on their head. What did it find? It found that all four of these timber sale areas did not support 18 Deere per square mile and, in fact, well below 18 Deere per square mile. So on second remand, the agency has abandoned these corrected results, as I've mentioned. But the remand memo doesn't address consistency with the standards and guidelines of the 1997 forest plan at all. There's simply no mention of the wolf provision. So back to this court's nifma jurisprudence, which it asks whether the agency, whether the court may be able to reasonably ascertain from the record that the Forest Service has complied with the relevant standards and guidelines of its forest plan. Here, at this late stage in the case, the Forest Service has made no effort to reconcile the two different sets of Deere modeling numbers, and it has made no explanation as to consistency with the standards and guidelines of the 1997 forest plan. So as I understand the relief that you're seeking from this court, it would be to vacate the determinations on these projects? That's right, Your Honor. And would that mean that, in your view, if the Forest Service wanted to go ahead, that you would start the process over in terms of NEPA and the other environmental statutes? Correct. And so the agency would likely have to redraw these timber sales because it's clear, using the corrected version of the Deere model, that these areas, timber sale areas, don't support sufficient Deere habitat capability. So if the panel were to agree with you, in effect, we would start all over? That's right. And the agency would come up with what they viewed as a scientifically defensible Deere multiplier basis and a recalculation as a result of the boundaries of these particular forest harvesting projects? That's exactly right, Judge Hawkins. But just a quick addendum to that, all the parties agree now that the agency, it has been using the corrected version of the Deere model. So it has been using? Well, on first remand. So it's already made the revised calculations on first remand. But what it did was explain how the Deere model results were consistent with the 2008 version of the forest plan, which the district court found was in error. Because remember that the original project decisions applied the 1997 version of the forest plan. When did this process start? These timber sale projects were approved in 2006 and 2007. Our lawsuit was initiated in 2008. So almost a dozen years. That's right. When you say, in response to where things would go from here, that the correct model is now being used or acknowledged. So both parties agree on that, you're saying. I'm just trying to understand. Well, the problem is that the agency has abandoned that corrected version of the Deere model in their second remand proceedings. I'm going to ask you a question that I will ask opposing counsel. Is this capable of mediation and resolution? Go back to all of the steps and start all over a process that's now 12 years old. At the start of your argument, I asked you if there was a way in which these foresting projects could go forward using an appropriately, scientifically defensible method of estimating Deere population. In theory, they could. But that would be only after the agency undergoes the appropriate. We deal in the sort of real world. Pardon me? We sort of deal in the real world, not in theory. My question is, is this capable of resolution by mediation? Could the parties sit down together and come to an agreement on Deere population and come to an agreement on the proper boundaries of these harvesting projects and life goes on? I don't think the parties could do that by themselves. I think that this would need to go through the appropriate round of public process, which includes NEPA review. Are you willing or unwilling to sit down and try to mediate this controversy? I would have to circle up with my clients. We did go through the court's mediation process at the outset of this appeal, and were unable to successfully resolve it through the mediation program. Was that with the in-house circuit mediators? It was, Your Honor. Okay. You've answered my question. Thank you. And I am eating into my rebuttal time, but before I sit down, I'd like to just impress upon the court a couple quick takeaways about this case from our perspective. And the first is that the Forest Service on the present appeal is largely attempting to relitigate this case based on the original records and on issues that this court has already addressed in 2011. To the narrow extent that the agency is relying on the remand memo, what's most notable about that document is what's missing. There's no explanation for the continued reliance on vol strata. There's no explanation as to consistency with the standards and guidelines of the 1997 Forest Plan, and there's no explanation for the change in position with regard to the application of the Deere multiplier. And with that, Your Honors, I'll reserve the remainder of my time. Thank you. May it please the Court, my name is Michael Gray, and I'm here on behalf of the Forest Service. It's difficult to see what the utility in a remand back to the Forest Service would be at this point where the plaintiffs have now conceded that the Forest Service is using the correct Deere model and has used it in this case, and the Forest Service concluded after doing so that it would not change its decision. And I think it stems from this idea that we think is incorrect, that the Forest Service has abandoned that analysis at this point. The Forest Service has not abandoned it, and I think going through the chronology here may help to understand that. This Court in the previous appeal concluded only that it could not understand the Forest Service's explanation of the Deere multiplier. On the first remand, the Forest Service took to heart some dicta that this Court had about evaluating whether a new NEPA analysis was required, performed with the current version of the Deere model, not a corrected version, as the plaintiffs say, but the current version based on the evolving science, and concluded that it would not change the ultimate decision and that it would not require any further NEPA analysis. And that's because when you compare the impacts of these alternatives to the none, a zero to one percent change in the capability of the habitat, whether you conduct these four relatively small projects on a 17 million acre forest, the largest one, and if you look at the numbers of that analysis, both initially and on the remand analysis and the supplemental information reports, they show that the Deere density numbers are either the same or perhaps one less in one of the projects, whether you do these projects or not. And so we presented that to the district court, and the district court said, well, you need to show why your initial decision complied with the 1997 forest plan because you didn't make a new decision. You decided that based on the new analysis, no new decision was required. And so on the second remand, rather than abandon that analysis, what we did was we said, well, let's gather together the information on the Deere multiplier and explain why the Deere multiplier, when the decision was made, complied with the 1997 forest plan. And that's the explanation in the remand memo, and as we've explained, the Deere multiplier in the previous version of the model, before the one used for these projects in 2006 and 2007, said for a habitat suitability index score of 1.0, we'll have 100 Deere per square mile as the multiplier. They went through a process, an interagency process with a panel that said the habitats, we think there are habitats that are better than what got the 1.0 score under the previous model, so we're going to have the model now go up to 1.3, but the habitat, the mid-volume, low-elevation, south-facing, low-snow habitat that had previously received a 1.0 under the model, that same habitat was still 1.0, so the 100 Deere per square mile key to that habitat stayed key to that habitat. And the Forest Service was well aware it was making that decision, and has explained it now, I think, hopefully to this Court's satisfaction, in the remand memo. Now, on Volstrata, the Volstrata data that we used in the version of the model for these projects was based on a recommendation in 1996 from the panel, which is at the supplemental excerpts 473, recommending incorporating the new forest-type stratification scheme into the model. That's Volstrata. And then there's a 2005 paper, which is in the record supplemental excerpts 198 and 199, evaluating Volstrata, and it says, Since Volstrata can distinguish timber volume, our study supports previous work that timber volume information can help indicate the quality of Deere habitat and recommends that timber volume strata should be used in place of volume class in the forest-wide model. So you have a study recommending it, and the Forest Service said, That's what we're going to do. That's the version we'll use in our model. Now, they said, Well, there may have been other versions. There may have been disagreement in the science, but when you're in the predictive realm of science in the expert agency's realm, then that's where the deference from this Court is at its highest. And so I think on both measures, both Volstrata in compliance with the 1997 plan and on the Deere multiplier, the Forest Service has now adequately explained exactly how this works, why its decision at the time was correct, and has now done the model that the plaintiffs say is fine, and said our decision wouldn't change because the impacts wouldn't change. So we would ask, in that circumstance, for this Court to affirm. Unless there are any questions, I'll cede the remainder of my time. Thank you. My question is the same question I had for your opponent. Is this capable of mediation? The United States would be happy to sit down. I don't believe it's capable of mediation based on what I think the plaintiffs would, the positions the plaintiffs would take. Okay. Thank you. Just a couple quick points. And I think that going back to the chronology of this case is instructive. And so the Forest Service approved these four timber sales based on the original record using a flawed version of the Deere model. This Court remanded. What did the agency do? It went back, corrected its errors with respect to Volstrata and the Deere multiplier issue on first remand. But it erred because it said, these new results are consistent with the 2008 version of the Forest Plan. The District Court in 2014 said, you can't have it both ways. You can't approve the original decisions under the 1997 Forest Plan and then establish consistency with this narrow part of the project based on the newer version of the Forest Plan. And that's this Court's jurisprudence in several cases, including the Friends of Southeast Future case that we cite to in our briefs. And so the agency went back again, and on second remand, it abandoned those corrected results and returned to the original Deere model runs. So the agency is not currently relying on the corrected Deere model. The agency is relying on the one that it was using in 2006 and 2007, which my clients, which the Alaska Department of Fish and Game, numerous parties, had told the agency was misapplying because of the Volstrata issues and the Deere multiplier issues. Would you clarify one thing? Because in your earlier argument, I understood you to say that there now was this agreement as to what is the appropriate configuration on the Deere model. Did I misunderstand? Yes, Judge McKeown. And that was my error because the agency, what it's doing now, has reverted to the old flawed version of the Deere model. On first remand, we submit that the agency had used the corrected version. But at this point, the agency has abandoned those corrected results. So really you don't agree on anything? In the second remand proceedings, we don't. All right. That's correct. And so at this point, I think the appropriate remedy here is vacature. This case has been ongoing for the past 12 years. The Forest Service has now had three opportunities to explain its use of the Deere model in consistency with the governing forest plan. It has failed each time, and we think it's time for the agency to go back to the drawing board. Start this 12-year process again. I don't think it's quite that onerous. It's simply reengaging with the public, something that the agency has neglected to do since the original decisions, reengaging with my clients, reengaging with the experts at the U.S. Fish and Wildlife Service, with the Alaska Department of Fish and Wildlife, and come up with a plan that meets its obligations under the National Environmental Policy Act and the National Forest Management Act. Unless there are no further questions, we ask this court to reverse the judgment of the district court. Thank you. Thank you both for your arguments. Greenpeace v. Stewart is submitted, and we're adjourned for the morning.
judges: Hawkins, McKeown, Owens